Nott, J.,
dissenting:
I approach the consideration of this remarkable case with reluctance. Not only its great magnitude and grave questions of constitutional and international law, but a long train of complex and conflicting circumstances, difficult to he justly comprehended, combine to render it perplexing, so that of the eminent jurists and statesmen who have from time to time examined it, hardly two have placed their favorable views upon precisely the same facts; and even the learned counsel who now present it are not wholly agreed among themselves as to the principles upon which it should rest or the rules by which it should be decided.
For more than fifty years this claim has been pressed upon the attention of two governments. Its equity has never been denied. The American government has urged its payment upon Spain, and the Spanish government has alleged that its payment involved the honor of the United States; and each has admitted that it should be paid. It has received the commendation of the second Adams, of Monroe, Everett, Buchanan, Olay. It has received the favorable reports of three committees in the Senate and of ten committees in the House; and a bill providing for its payment has twice passed the former and once passed the .latter, but never so as to become an act of the same Congress. It also has been once tried by this court and divided the judges, who have given conflicting opinions of unusual learning, ability and research. Finally, the debt was due to an eminent merchant who always received from the two governments of America and Spain, distinguished, and, perhaps, unequalled consideration, and whose name is now honorably stamped, by illustrious public services, upon the greatest successes of our national arms. With all these great advantages and while a thousand unworthy claims have been successfully carried through Congress, this one remains unsettled to-day as when it was first presented to the government in 1808, having well nigh worn out two generations in the weary pursuit of tardy and uncertain justice. Whether that justice can be awarded by a court of law is the important question which I now with reluctance proceed to examine.
Without attempting to follow at length the learned and ingenious arguments that have been addressed to us, I propose to examine some of the grounds upon which the case is pressed and to point out the principles by which I think it must he considered and governed.
It is undoubtedly true, that when the citizen of a State is injured by a foreign power, he has no lawful means of redress of his own and must seek relief through his government and through it alone. When *300 such cases are brought to the knowledge of a government there is placed upon it an obligation to pursue the remedy which justice to its own citizen demands and which the law of nations gives. Whether such claims arise from personal injuries, or whether they spring from contracts voluntarily accepted, there is still an obligation greater or less which requires the active aid and interposition of the government. If, moreover, for the sake of adjusting national difficulties, or from inability to contend with a more powerful antagonist, or from any other cause, the nation of the injured citizen shall not seek the redress it owes to him, there is said to be an obligation resting upon it to make good to him his losses. So, too, if there should be a class of cases which for the national welfare the government should abandon or formally renounce and agree to release to the offending party, there might be an obligation arising to make good the losses which individuals were compelled to bear for the benefit of the body politic. But these duties which a government owes to its citizens, I understand to be political and not legal obligations. Of them the judiciary has no jurisdiction, and they must be examined and adjudged by another tribunal, which in this country is Congress. When such a claim is brought before Congress they are the proper and exclusive judges. It is for them to determine whether the obligation existed — whether the course pursued by the government was warranted or excused by the circumstances — whether the claimant suffered damages, and whether he is entitled to relief. Political obligations resting upon governments are analogous to, though not identical with, moral obligations resting upon individuals, which ethical writers may point out and assert in strong language, but which courts, either of law or equity, cannot enforce.
There is also a class of injuries arising from acts on the part of government which resemble the misfeasance of an agent; and in this case the United States have been likened to an attorney who has given away his client’s case, wherein the compromise with the adverse party would stand, yet the attorney be held liable for the wrong done to his client. We have so frequently held that in this court a party can recover against the government only upon contract express or implied, that it is needless to repeat the reasoning or to cite the cases; it is enough to say that when the illustration points to the delinquency of an individual as the groundwork of the action, it only establishes the fact that the claimant cannot recover here. If in this case the United States were guilty of such acts as would render an ordinary agent or attorney, liable, the case is confessedly beyond our jurisdiction.
It is evident that this conclusion will remove from our contemplation *301 a large mass of the evidence and much of the laborious arguments which have merited and received our attention. We may he of the opinion that the defendants were remiss in not pressing the claim, or delinquent in compromising it; that there was inexcusable delay in demanding' the original documents ; that the positive refusal of Spain to furnish them, or her neglect to furnish them promptly, constituted a new injury for which the defendants were bound to seek reparation; that this new claim was wrongfully renounced by the defendants under the convention of 1834, and yet be obliged to say that these were all political obligations, not to be enforced in a court of justice.
As much has been said about the convention of 1834, and one of the claimant’s counsel has even insisted that if ‘‘ the accounting at M.adrid extinguished the pre-existing accounts and created a new debt of Spain,” then that the right of the claimant to recover here under this convention of 1834 is “ certain, absolute, and incontestable,” I may remark that by that convention the United States simply became the trustee of Spanish “ inscriptions ” to the amount of twelve millions of rials vellón, which “inscriptions” 11 or the proceeds thereof,” they were bound to distribute “ among the claimants entitled thereto.” (8 Stat. L., p. 460, art. I.) The “ note or list of the claims of American citizens against the government of Spain” (art. IV,) cited by the learned counsel as fixing the liability of the United States, was something posterior to the payment of the fund and something which was intended merely for the information of Spain, and which it was optional with her to demand or not. The fund conveyed was also to be “ in one or several inscriptions, as preferfed by the government of the United States,” and it was either the “ inscriptions or the proceeds thereof ” which were to he distributed “ among the claimants entitled thereto ” in such manner as they, the United States, might “ deem just and equitable.” It may be that Mr. Meade, as one of those claimants, possessed a legal or equitable interest in the fund, but that interest cannot possibly be the object of this action, for the petition neither avers nor attempts .to aver that Mr. Meade ever sought to share in the proceeds of those “ inscriptions,” nor that the United States ever refused to award him the share to which he was entitled. Neither is there a particle of evidence to sustain such a declaration nor to raise such a presumption.
It has been argued, also, that these claims against a foreign government are property, and that the renunciations of a treaty are an appropriation of them by the government for public purposes; and Vattel is cited to prove that if they are taken by the exercise of the right of eminent domain, the full consideration must be paid.
*302 These claims, which are neither authorized nor allowed by a foreign power, are something too shadowy in law to be termed property. Even if they arise from contracts they lack the essential element of “choses in action,” and possess no remedy which, in a legal sense, can be enforced.
The renunciations of a treaty ordinarily do not mean that the claims are taken by the one government to be given to the other, but simply that the former will refrain, as the representative of its citizens, from longer vexing the latter. If, in such cases, there is an injury suffered by the individual for the public good, it is not through the action of the government, but by its refusal to act; and of this injury, and of its merits and extent, the legislature is the only and the appropriate judge.
Yet I do not mean to say that where money has been paid by a foreign government under a treaty which in terms appropriates it to certain parties, there is not such an implied contract or equity as would uphold an action in this court. In such a case the suit would be an equitable proceeding against the fund, analogous to an action at law for money received by A to the use of B. Yet where there was no legal obligation to act, the government may prescribe by treaty or by statute the terms and conditions upon which the fund shall be distributed, and it may designate or appoint the tribunal to whose scrutiny and decision all claims shall be subjected. And this brings me to the real difficulty of this case — the rock upon which it has always struck.
If Mr. Meade was simply a claimant under the treaty of 1819, were not all his rights and remedies bound and limited by the treaty ? It created a special .tribunal to adjudicate the validity and the amount of all such claims; and it prescribed, in unmistakable terms, the means by which such claims should be investigated and established. Is not the decision of that special tribunal final ? Conceding that the commissioners erred in rejecting the claim; conceding that the award of the junta was as evidence final and conclusive upon all the parties ; conceding that the United States were estopped from questioning either the validity or the amount of this award ; still, if the commissioners had jurisdiction of the claim, can their errors be corrected in this court or by this action 1 In the case of the New England Mississippi Land Company (1C. Cls. B.., 135) it was held “ that money retained hy the government under an award of a tribunal specially clothed with jurisdiction of the subject-matter,” “ is in legal effect money paid under a judgmentand that an action in this court to recover it back “is not maintainable, because a judgment cannot be set aside in that way.” *303 There are other cases in other courts to the same effect; but is there a single case reported in any of the books where it is held that the award of such a tribunal can be disregarded or its errors and mistakes corrected in a collateral action ? I am pursuaded that if there were such a case, the indefatigable counsel for the claimant would have brought it to the light and have pressed it upon our attention.
There is, however, the celebrated case of De Bode v. Regina, which occupied much of the attention of the English courts during a period of fourteen years, and which in a number of points, including its large amount, its unquestioned equity, and the long train of harassing mischances that fatally attended upon it, is remarkably like the present one.
The government of France had paid to that of Great Britain a sum in gross for spoliations of British subjects, and by the terms of the treaty France was released and Great Britain assumed the claims. There were “ commissioners of liquidation, arbitration, and award,” to whom all claimants were to prefer their claims. The Baron de Bode was one of these parties, and possessed an undoubtedly just and proper case, which these commissioners erroneously and improperly rejected. There was a balance remaining of the fund when the commission expired, which was paid over to the Lords of the Treasury; wherein the case differs from, and is stronger than the case at bar. The Baron de Bode sought to recover payment of his claim out of this balance; first by mandamus, and then by that proceeding which so closely resembles an action in this court, the petition of right. In these attempts he was utterly unsuccessful. Mr. Justice Coleridge, sitting at chambers, decided against him, (6 Dowling Pr. R., 787;) the Queen’s Bench decided against him, (8 Ad. and Ellis., Q. B., 208;) the Exchequer Chamber decided against him, (13 Ad. and Ellis, 364;) and finally the House of Lords decided against him, (3 Clarke, H. L. Cases, 469.) In all of these decisions the judges expressed sympathy and regret, but were firm in their conviction that the " suppliant,” as the party is termed in the petition of right, had no legal case. One of the learned counsel who have addressed us has met these decisions boldly, and indeed insists that “ the doctrine of the case of De Bode sustains this claim in all its 'parts''’ To sustain this assertion he argues that it was decided “ on this single ground, that the petition of right as a remedy, and as exhibited in the cause, could attach only to the specific fund provided by the treaty ; and as that specific fund was disposed of by act of Parliament, therefore the party could not have redress by this petition of right.”
*304 The learned counsel then makes this distinction between the rule applied in the case of De Bode and the law applicable here. “ The single technical point made in the House of Lords was that the special fund was otherwise disposed of and could not be used. On the contrary, if the .petitioner in any case before this court makes out his right, it is no answer to his right to say that the appropriation, out of which he should have, been paid twenty years ago, has been expended or passed to a balance in the treasury. If he makes out his case, the court must award him damages, and he is to get the damages from a new fund appropriated by act of Congress to satisfy the judgments of this court.”
I do not think that this view of that case can be entertained. It is true that the case was encumbered with a number of perplexing circumstances, and that the language of some of. the decisions does not clearly set forth the point on which the case was finally determined. It is also true that the opinions of the judges are tinctured with the views of English lawyers touching the infallibility of Parliament, and that when they say that Parliament “ was unquestionably competent to dispose of all the money as it thought fit, and might have applied it to the public service of the year or given it for any other purpose, and so disappointed the just expectations of the claimants,” (Parke, Baron, 13 Ad. and Ellis, 384,) the reasoning is entirely inapplicable to the law of the United States. Yet, nevertheless, as the case of De Bode passed through the different courts these supernumerary questions and this unnecessary reasoning dropped off; -so that when it came to be decided in the House of Lords the decision was narrowed to this single point: “ That the suppliant has no claim except under the statute and in the mode 'pointed out by its provisions.’’’ (3 Clarke, H- L. Cases, p. 468.) The Lord Chief Baron does not indeed call the commission a tribunal, nor pronounce its awards judgments, as this court has done in the New England Mississippi Land Company’s case; but he does say that the act of Parliament, which, in that case, takes the place of the treaty in this, “meant to provide for the application of the whole fund, and leave no part to be dealt with except under its enactments. Any claimant, therefore, upon the fund must proceed according to the provisions of the statute, and has no other remedy.”
I am, therefore, unable to accept the deduction drawn by the learned counsel. If the premises are alike, the conclusions to be drawn from the two cases appear to me to be identical. Both substantially pursue the same remedy and seek the same relief. In the English case there was a fund received under a treaty, in which fund the “suppliant” *305 bad possessed an interest, and. which had been paid into the national treasury. In this case there was a fund derived from and being the consideration of a treaty, in which the claimant possessed a like interest, and which has been paid away to other parties. The case of De Bode holds that the statute provided the “ suppliant” with a remedy, and failing in that, his remedy was exhausted. In other words, I think that if Mr. Meade was bound to go before the commission to establish his case, then, that it was a tribunal whose judgment, however erroneous, cannot be questioned collaterally or corrected in this court, and that the ease of De Bode is an authority in point and fatal to a recovery here.
Since I arrived at this conclusion my attention also has been called to the case of Comegys v. Vasse, 1 Peters, 212, a case which seems to have escaped the research of all the learned counsel, who on this and former trials have presented the interests of the defendants with ability and care. There the Supreme Court reviewed this article of the treaty. The point was not necessarily before the court, but the opinion of Mr. Justice Story is unmistakable and clear. He says :
“ The object of the treaty was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of the asserted claims upon Spain for damages and injuries. Their decision within the scope of this authority is conclusive and final. If they pronounce the claim valid or invalid — if they ascertain the amount, their award in the premises is not re-examinable. The parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review in any judicial tribunal; an amount once fixed is a final ascertainment of the damages or injury. This is the obvious purport of the language of the treaty.”
I now proceed to examine the case under the principles by which I think it should be considered and decided.
The treaty of 1819, while it is an instrument for the adjustment of international differences, is something more, being for all intents and purposes a grant or conveyance of an estate. With the political obligations we have nothing to do; but with the legal obligations growing out of this bargain and sale, I perceive no reason why we may not deal. The illustration of the ease, to my mind, as between individuals is not that of an agent neglecting the interests of his principal; not that of an attorney sacrificing the rights of his client; not that of a creditor creating a fund for his debtors, but that of an estate conveyed,, subject to an encumbrance. 'It is perfectly well settled that where.a *306 man makes a deed subject to a mortgage, which the grantee assumes, the latter cannot question either its 'validity or its amount, and the courts even have gone so far as to hold that if the mortgage is. tainted with usury, and by statute declared to be absolutely void, it does not lie in the mouth of the grantee to make that objection. Post v. Dart, 8 Paige R., 641. In this case it is not open to dispute, but that Spain 'sold the land subject to the encumbrance; the question is, “Have the United States performed their covenant ? Have they complied with the condition ? ”
A majority of this court on the former trial answered that they had; and that all which they were bound to do was to establish the com-. mission provided for by the treaty and to pay the claims which it decided to be valid. I am not satisfied with the reasoning.
In the first place, I am not satisfied with the assumption that the rule1 of the municipal law, which prevents a written instrument from being waived by parol, has a place in the law of nations. In this instance, the treaty had hardly left the country when Mr. Adams gave notice to the Spanish minister that it must be understood to mean something entirely different from its text. The difference, too, was material and not formal; for the treaty provided that all private grants made after a certain day by Spain should be void, and that all before that day should be valid; and the United States sought to change the terms of the treaty by an ‘‘ understanding,'’ and by a reference to what was said during its negotiation. If the treaty had been ratified by Spain after receiving this notice without revoking these private grants, would the United States have been bound by its terms ? If the three Spanish grantees had come to this country and claimed their grants by the very letter of the treaty, would the United States have acknowledged their legality ? Mr. Adams has answered explicitly that they would not.
But passing this question as to the law of nations, how does the - case stand under the municipal law? In 1819, when the agreement was executed by the one party and bears date, there were certain claims existing against the other party of which neither the validity nor the amount was established nor acknowledged. It was therefore agreed that there should be a special tribunal to examine the claims and to establish their validity and amount. Mr. Meade’s claim was one of those contemplated by the treaty and by the parties. It was not established; it was not liquidated; it was not even acknowledged. A large part of it was for personal injuries unlawfully inflicted by the Spanish government, and the true valué thereof was necessarily a *307 matter of opinion, and until fixed by a verdict could not be estimated or known. But the agreement was not executed by Spain, witbin the ■time appointed, and became, in the words of the American minister, “ as if it had never been made.” Then Mr. Meade did what he undoubtedly had a right to do; he surrendered his various former claims to Spain and acquired a new claim which embraced and consolidated in a single amount the substance of his contracts with the Spanish government, his damages for personal wrongs, and an entirely new element or item, being interest on the first-mentioned items down to the date of the liquidation. It is at this point that this dilemma seems to have presented itself: If there was a novation, did not that remove the claim from the benefits of the treaty 1 And if there was not a novation, then was not the claim to be established in the manner prescribed by the treaty ? And it is at this point that the counsel for the claimant have insisted that there was no novation, and that if there was, the defendants would still be liable by their acts under the convention of 1834. I am compelled to dissent from both of these conclusions.
The proceedings of the Spanish junta, be they liquidation, novation, or award, entirely changed the claim of Mr. Meade in every leading characteristic, in time, in form, and in amount. The evidences of debt were not only surrendered but •'cancelledthe vouchers which he gave up were carried into the financial department of the government ; the interest which had accumulated was allowed to him; the personal cause of action was fixed; and finally all of these were compounded, and merged in one new amount, and a new evidence of debt given and accepted therefor. No court in the world would ever allow such a transaction-to be reopened. When, therefore, in August, 1820, the negotiation for the grant of the Floridas was renewed, there was a new element not provided for by the agreement. If this new claim was to be added to those enumerated in the treaty, the United States might have something more to pay as the consideration of the grant; and if, on the contrary, the claims of Mr. Meade were not to be included thus, they being merged and lost in a new debt, then the United States might have something less to pay. Now, when through the oversight of two individuals such a case comes into a court of justice, it is always a difficult and painful task to decide upon whom the loss shall fall; but when it can be shown that the parties themselves anticipated and provided for the contingency, then such evidence is admissible, not for the purpose of varying or explaining the written instrument, but to provide for a new matter which it did not provide *308 for, and to show the construction which they themselves agreed to place upon it.
That evidence establishes certain facts which are not a subject of dispute. The royal commission, or junta, was instituted at the request of the United States, given before the signature of the treaty, and was composed of officers of the highest rank and position, viz : “Don Bruno Vallarino, minister of the Council of Indies; Don José Vazquez Ballasteros, fiscal of the Council of Finance ; the Marquis de las Hormazas, deacon minister of the comptrollers-general department ; and Don Juan Florin, clerk of the secretary’s office, finance department.”
The junta were, “ as special commissioners, invested with full powers to adjust and settle the several claims of the petitioner,” and “ to settle the compensation to which he may be entitled for losses and personal suffering.”
The principle upon which they proceeded is stated by themselves, thus: “ From the very beginning the junta thought that the business was of a mercantile nature, by itself and by the quality of the claimant, who was publicly known as a foreign merchant. They took into their consideration, as they ought, the supplies from which the claims proceeded, the circumstances under which he furnished them, the incalculable benefits they produced to the Spanish government, and what misfortunes these acts of beneficence had brought upon the dispenser of them, who, far from that satisfaction of acknowledgment and gratitude which he ought to have received, from accidents foreign to the royal mind of your majesty, not only has been deprived of a great part of his capital and interest, but he has suffered many ■ other losses, insults, and personal injuries which aggravate the wrongs of which he complains. With such precedents before them, the junta recurred to the principles of justice, equity, and policy, according to the character of their commission, and they proposed to determine this business accordingly, clearing, simplifying, and reducing the matter which had been the object of their greatest attention and the most extraordinary pains. They could not, therefore, lose sight of the principle of loss, of gain, and damage occasioned thereby, &e., on which Mr. Meade founded his claims. Besides the moral reason of these principles, they are acknowledged and have been adopted in the laws of all civilized nations.”
They performed their work with extraordinary particularity and care. On the 30th September they made a first report upon ufowteen claims presented by Mr. Meade,” which was referred back to them *309 to “ consider and report about the justice of crediting interest in debts originating in contracts in which such interest was not expressly stipulated, and on the effect which such a precedent might produce.” On the 15th November they made a second report, giving their reasons for allowing interest. On the 3d January, 1820, the whole subject was referred hack to them because, as the order states, “ his Majesty cannot help observing that there is wanting in the report the ascertaining of the dates of many payments made to Mr. Meade; and this being an essential and indispensable requisite in liquidating accounts, and as there is no reason why this may not be done, when the public offices in which the payments were executed exist, his Majesty has determined that the whole body of documents shall be sent to your excellency in order that through the office of liquidation of supplies, and with the assistance-of Mr. Meade, a settlement may he made with all exactitude and despatch, subdivided into as many parts as there have been contracts ; that at the bottom of each of these, the delivery of the articles, dates of said delivery, amount of hills given, with their dates and the date of each payment, shall be expressed with all clearness and distinction, without omitting to mention the premiums or profits that were offered, and whether they have been paid or not; in short, everything that may contribute to fix a true adjustment and settlement must be therein expressed. It is the wish of his Majesty that the personal claims of Mr. Meade shall not, under any consideration whatever, be mixed with his claims as an agent for other persons, who, perhaps, are not so much entitled as he is to those considerations which are due to him for the important services which he has rendered. The King also wishes that no means or fatigue may be spared in the immediate despatch of this affair to avoid damages and losses, and that it may be decided according to justice.”
On the 9th May an order appears to have been made which states that “his Majesty having taken again into his consideration the whole matter, together with the report sent from the general comptroller’s department, upon the last reclamations of Mr. Meade, submitted to him, has been pleased to approve the liquidation of his credits against the royal finance as adjusted and settled by the royal junta appointed for that purpose, and to order that said junta shall extend the proper document thereof, and send it to this department for the sanction of his Majesty and for the other correspondent purposes necessary for the security of the interests of the nation. That respecting the five sums adjudicated for damages and personal injuries, they shall try to reduce them as much as possible in favor of the royal finances, compromising *310 on this point with. Mr. Meade, and that the document which the junta shall make out must be couched in general t.erms, without making any mention about the particular mode of payment.”
Finally, on the 17th May, 1820, the junta made this last report:
“And, lastly, we do hereby certify that in compliance with the above-mentioned order of his Majesty, and having employed on our part all the means that prudence could suggest, and after holding several conferences with the concerned, we have compromised the matter, and agreed that the eight million five hundred thousand reals for damages and personal injuries claimed by him according to his reclamations shall be reduced to five million four hundred sixty-one thousand and five hundred reals vellón, making the sum total due to Mr. Meade for his own claims and for those of the persons he represents, nine millions eight hundred twenty-three thousand seventy-two reals and eleven maravedís, which amount he must receive from the royal finance for all his claims to principal and interest, (the latter calculated down to the date of the liquidation,) and for the damages and pergonal injuries above mentioned.
This report was transmitted to the minister of finance on the same day, in a letter which stated that “the junta have done everything in their power to settle and adjust said damages in the manner which they have thought most advantageous to the interests of the royal finance, before proceeding to extend said document, and after several official notes passed on the subject, and after having held repeated conferences with Mr. Meade, his reclamations have been fixed and reduced to the sum expressed in this document. It having been out of the power of the junta to obtain any further deduction, they have extended the document- in those terms which they hope will meet the views of his Majesty; the best terms they have been able to obtain being without any precedent to guide them on the occasion. We enclose your excellency said document, and likewise the original documents of the claims of Mr. Meade, in order that your excellency may give them the proper direction, and cause them to be respectively cancelled. Wishing to regulate our operations according to the will of his Majesty, please to inform the junta if the terms of the document and all the proceedings are correct and meet the approbation of his Majesty.”
These reports of the junta were accompanied by what were termed “plans,” showing with scrupulous minuteness each item allowed, whether of principal or interest. It is not surprising, therefore, that on the 19th May the King of Spain was “pleased to approve this *311 liquidation.” Nor that on the 21st May the minister of finance transmitted to Mr. Meade the award of the junta with an official note, in which he said: “ The junta gave in their award, and consulted his Majesty on the subject, who having been pleased to approve thereof and adopt the same, the said junta has extended, in legal form, a certificate of the entire credit due to you by the nation, the sum of which amounts to Itv. 9,823,072 1 mrs., in the terms and for the reasons therein specified, which document, with his Majesty’s approbation thereunto annexed, and certified by me, I herewith transmit to you by his royal order, for your security, and for whatsoever other purpose or object conducive to your interest. • God preserve your life many years.”
It is proper here to say that the vouchers which passed from Mr. Meade, to be transmitted to the finance department and cancelled, did not come to the possession of Spain through the hands of the American minister, as has been assumed in some of the arguments, but were handed by Mr. Meade directly to the president of the junta; and I am also satisfied that after the signature of the treaty the United States took no part in procuring this liquidation of the claim. Yet, the thing was not done in a corner; for both of the parties immediately notified the United States, the Spanish government through the American minister, and Mr. Meade through the Secretary of State. Both of these officers replied, as cited in the opinion of my brother, the Chief Justice.
The evidence next shows that Mr. Meade endeavored to collect this new and established claim from Spain, and that on the 20th June, 1820, he addressed a memorial to the Cortes, in which he says : “ It is only necessary to state that at last, after innumerable steps adopted by him, he has been able to obtain from the government a liquidation of his demands, from which it results that the national finances are indebted to him in the sum of 9,823,072 reals of vellón, as more fully appears by the document whieh, with the approbation and by the order of his Majesty, has been delivered to him as a security by the minister of finance.” The memorial then states that “ Meade has determined to propose to the Spanish congress that if it should adopt the resolution of ratifying the treaty of cession of the territory of the Floridas to the American republic, it would keep in mind this debt in order that, as being comprised in the stipulated indemnities, the payment of this sum should enter as a condition, with that preference which justice, the privileged nature of the demand, and its merit require, for which purpose it ought to be excluded from all fro rata. But in case the *312 ratification should not take place, and this agreement should not he made, it is then indispensably necessary that Congress should issue a corresponding decree in order that the government may pay this obligation by the national treasury.”
The Spanish Cortes referred this memorial to the committee charged with the consideration of the treaty, and received the assurances of the American minister “ that the debt due to Bichard W. Meade would certainly be paid to him by the United States if the treaty was ratified by the Spanish government” and “the large cessions made to the Duke of Alagon, Count Punon Rostro and Mr. Yargas” were “ totally annulled.” Mr. Forsyth did not understand that the members who waited upon him were a committee of the Cortes, and he did not report the affair to his government, but he has been careful to say : “ I wish it to be clearly understood that I do not question the accuracy of Joseph Moreno Guerra’s statement further than relates to my conversation with him and Yturis as a committee from the Cortes.”
On the faith of these assurances Spain did two things : first, she ratified the treaty of cession and thereby conveyed the Floridas to the United States. But, second, she went beyond the terms of the treaty and annulled the three large grants made to Spanish citizens. The leading and only consideration operating upon the Cortes for this last act was the agreement that the claim of Richard W. Meade should be paid.
If through the mistake of the American minister this agreement or understanding on the part of Spain had not been communicated to the United States before their final acceptance of the treaty as modified by the acts of the Cortes, it might be an embarrassing question whether the defendants are bound and estopped by the acquiescence and assurances of their agent, they being in ignorance of the belief in which Spain acted. But as if to provide for that difficulty, the memorial of Mr. Meade, addressed to the President on the 8th February, 1821, expressly said: “As soon as its definitive and official recognition, in the form of the certificate just mentioned, was communicated to me by the Minister of Finance, I petitioned the Cortes to order its immediate payment, and to designate the mode of payment. I could obtain no definitive resolution from the Cortes until the 5th October last, the day they decided in favor of ratifying the treaty for the cession of the Floridas to the United States, upon which occasion they ordered that my memorial should be united with the papers relative to the treaty, and submitted to the King, in order to have it ascertained whether the American government had consented to the introduction *313 of my individual claim into tbe negotiations on the treaty; and, if so, that the American government had distinctly assumed upon itself the payment of my claim, and had wholly exonerated Spain from it; but if it should he found that my case had not been taken into view by the negotiators, and was not distinctly understood as embraced in the treaty stipulations, they, in that case, decreed the immediate payment of the debt by the Spanish government. Upon this reference from the Cortes the Spanish minister of state pronounced an unequivocal opinion that the debt had been distinctly and specifically assumed by the United States in exoneration of Spain, or would be so upon the exchange of ratifications; consequently I was referred to the eventual ratification of the treaty for the ultimate satisfaction of my claim.”
This memorial was transmitted to the Senate on the 14th February, 1S21, by a special message of President Monroe. The notice was therefore brought home to the treaty-makingpower of the government as completely as such a notice could be, and with this notice before them the President and Senate accepted the cession of the Floridas.
The case, as between Spain and the United States, was concisely, but with admirable clearness and effect, summed up by the Spanish minister, Don Fivas y Salmon, in his letter to the Secretary of State, April 15, 1823, while the Spanish claims were still before the commission :
“ This debt is, in truth, perhaps, the only one that has been solemnly acknowledged by his Catholic Majesty. It was done at the earnest solicitation of the minister of the United States at Madrid, and its final liquidation and acknowledgment took place at a time and under circumstances that cannot for one single moment authorize the slightest doubt as to its validity and amount.
“ The amount of the debt was laid before both governments during the negotiation. The liquidation of it could only be effected by the parties interested in the contracts and the wrongs and damages it claimed compensation for; and the ascertaining the precise sum due appeared to be a subject of equal interest to both governments. It was at last thus represented and earnestly insisted on by the American government both prior and subsequent to the date of the treaty, and his Catholic Majesty acceded to the wishes of the American government, and, anxious that there should be no further cause of complaint, selected four counsellors from distant tribunals, and instructed them to examine in the most scrupulous and minute manner into all the circumstances attending on so complicated an account, and which required all the knowledge and practical information of the Spanish *314 laws and commercial rales of the nation to be enabled to form a correct view of the whole transaction. No affair of the kind ever underwent a more particular and thorough investigation, not only by the commissioners appointed for that purpose, but subsequently by the Treasurer General and the Comptroller General’s department and the Minister of Finance, and it finally received the full sanction of his Majesty himself.
“Under such circumstances, his Majesty feels that he cannot view with indifference or remain silent when it is attempted to invalidate so solemn an act. The Spanish nation was most certainly responsible for the full sum acknowledged due. The government of the United States, by the subsequent ratification of the treaty, assumed and took on itself this debt, in virtue of the fifth renunciation contained in the eleventh article, with a perfect knowledge of its amount, which had been officially communicated long prior to the conclusion of the treaty to the minister in Madrid, for the information of his government, by the Secretary of State of his Majesty, and most certainly, under' all these circumstances, it was not to be expected that any further information would be required on this subject.
“ There cannot exist a doubt that if the treaty of 22d February had not been concluded that Mr. Meade would have received from the Spanish nation the full amount of his debt. And his Majesty cannot perceive the justice of the commissioners in first attempting to disavow the debt in toto, as not included in the treaty, and much less would his Majesty have supposed that so solemn an act of his government— an act of concession which was founded in a great measure on the interposition of the American cabinet, and which was done in the most perfect good faith — would have been questioned by the agents of the American government.”
In this communication the Spanish minister refers to the treaty and insists that the claim was included in the fifth renunciation. The members of the Cortes who testify to the understanding in which that body assented to the ratification, also use the word “ treaty,” and speak of an assurance that the claim should be considered within the benefits the “ treaty.” Hence, it may be said that if the Cortes understood the claim to be merely within the treaty, they must also have understood that it would be examined and adjudicated in the manner prescribed by the treaty. Two very plain answers may be given to this inference.
In the first place, the witnesses manifestly refer to the treaty as a deed of cession, and say in the plainest and most positive terms, that *315 the Cortes were assured and believed that this claim would be paid by the United States if the three 'private grants were annulled by Spain; and they most positively deny that the Cortes would have annulled those grants, if it had been for one moment supposed that this government would not have paid the claim without hindrance or evasion.
In the second place, if it be assumed that this was indeed the extent of the obligation, and that all which the United States had to do was to submit this claim to their own commission and pay it when the commission so decreed, the fact still will remain that the United States did not perform even this duty; for the claim, of 1820 never was submitted to the commission by the government, and the claim which the commissioners rejected was the old claim of 1819.
When this claim of 1820 came before the commission it was evident enough to the commissioners that they had no jurisdiction. The president of the commission was an experienced judge and he quickly apprehended the fact, though his opinion does not state it with desirable clearness. It was not for the commissioners to pass upon the subsequent agreement nor to do anything beside adjudicating the claims specifically enumerated in the treaty. Accordingly President White says:
“ To bring this claim within this treaty it must b.e shown to have existed before the date of the treaty. If it did exist before the treaty, and is one embraced within it, then the parties have, by mutual consent, provided for the establishment of a tribunal, whose duty it is to examine the validity, as well as the amount, of the claim; but if we admit this evidence, then Spain herself through her own officers, is still to adjudge the validity and full amount of the claim; and the commissioners have nothing to do but follow on, and, for form’s sake, reallow the claim, the validity and extent of which have been already ascertained.
And his meaning is further illustrated when analyzing the award of the junta.
“Attend to its contents” he says; “ some of the items possibly grew out of contracts, either express or implied; others undoubtedly out of tort. That of the imprisonment of Mr. Meade certainly had no existence as a contract until the time of this award, after the date of the treaty. If we view that item as existing in the light of contract, there is an end of that matter, because it must have been tort until merged in the award or judgment; and then the judgment being the only evidence of the contract, the contract and the evidence of it are *316 one and the same thing; both too late to he compensated or renounced under this treaty.”
The commissioners therefore held that they could not entertain this claim of Mr. Meade, but they determined evidently to wink at the fact that the original claims were merged in and extinguished by “ the award or judgment,” as they themselves call it, and to allow Mr. Meade to exhume and prove them if he could.
But the error of this course did not lie with the commissioners. When the executive officers of the government found that the grant of the Floridas had been made by Spain upon the express assurance and with the express understanding that this claim of an American citizen, adjudicated with extraordinary care at the instance and with the approval of his government, was to take the place of one which had existed at the date of the treaty, but which had been extinguished before its ratification, and was to be considered as a part of the consideration for making the cession and annulling the private grants, then the State Department should have withdrawn it from the commissioners, and eventually should have allowed this award of the Spanish commission and the several awards of the American commission to participate equally in the common fund. That the government paid away the money with which they might have satisfied this claim is no concern of the claimant and was no concern of Spain. The chief and mortifying fact remains that the United States have not legally discharged the obligation which they assumed toward one of their own citizens, and have not honorably performed the agreement into which they entered with a foreign power.
Such, I think, was the law as between the United States and Spain, and such was the ground upon which I was disposed to rest the case. But further reflection has convinced me that an additional principle must be applied as between the United States and one of their own citizens, for reasons which I now proceed to state.
I assume the law to be as asserted by the defendants’ Secretary of State in 1821, and as claimed by their solicitor to day, viz :
“ The claimant by contract cannot resort to the interposition of his own government to obtain from the other satisfaction for his claims to the same extent as the claimant from wrong. The government of the claimant by contract can interpose in his behalf only by its good offices, and cannot, as the memorial states, press to the extent of reprisals for satisfaction of the claim. It has no right to interpose at all without the solicitation of the claimant himself, who, having staked his interest upon his own confidence in the government with which he contracts, *317 may properly abide by the result of that confidence without calling upon his country to make itself a party to the demand. But if he does appeal to his own government for that adventitious aid to which other contractors with the same party and on the same security cannot resort, he thereby voluntarily makes his claim a subject of negotiation and of those compromises in which all national adjustments of individual claims must and do always consist.”
I also assume as a settled principle of international law that one nation has power to renounce or release the claims of its citizens upon a foreign government, and that when they are thus renounced or released the latter will be discharged from all obligations respecting them; or, as was said by Baron Parke in the case of De Bode, (13 Ad. and Ellis, 2 B. R., p. 383,) “ every subject is bound by the treaty of his sovereign just as if he had been a party to it.”
Under these rules and from the facts established in the ca¡se I draw these conclusions.
Before the 22d August, 1819, when the right of Spain to ratify the treaty ceased and the minister of the United States declared that all causes of difference and dispute would ‘‘stand in the same situation as if that convention had never been made,” Mr. Meade had submitted his various claims to the direction and control of the defendants, and the defendants had afforded him their aid and were invested with authority to compromise or adjust these claims in such way and upon such terms as to them might seem best.
After the 22d August, 1819, and before the ratification of the treaty by Spain, Mr. Meade, without the aid or interposition of the defendants, but with their knowledge and assent, prosecuted his various claims in a Spanish tribunal and procured therein a decree, judgment, or award, final and conclusive as against Spain, and forming as high an evidence of indebtedness as could be furnished under the laws and customs of that nation.
By this decree, judgment, or award, Mr. Meade ceased to be a claimant and became a CREDITOR of Spain. His previous unacknowledged claims which, as against a government, were not even choses in action, became merged and lost in the award of the Spanish junta, which was as much property as a treasury bond, or any of the national evidences of debts which are sold in the markets of the world.
By the 5th renunciation of the 9th article of the treaty of 1819, as construed, by both Spain and the United States, this property was taken from its owner against his wishes and without his consent, and was paid by the defendants to Spain as a part of the price and con *318 'sideration given for the Floridas, and as the sole consideration for the annulment of the private grants to Spanish citizens. And it was taken by the defendants with full knowledge that Mr. Meade had ceased to be a claimant upon Spain, and that he regarded this evidence of debt as property of the full value which it professed to bear.
The defendants have never paid for this property nor afforded the •means of procuring yayment. The commission established by the 11th article of the treaty had jurisdiction only to establish the validity and amount of claims against Spain existing prior to the 22d February, 1819, and had no jurisdiction to award the value of property taken by the defendants on the 19 th February, 1821; and the award made by the commissioners against Mr. Meade was and purported to be an award on the Spanish claims which he no longer presented or owned, and was not and did not purport to be an award against his claim upon the defendants for the private property which they had taken for public uses.
The property of Mr. Meade was transferred by the 9th article of the treaty, not because the article in terms extended to the property, but because the article was thus construed by both Spain and the United States. The claim of Mr. Meade was not embraced by the 11th article because that article in terms related to other claims, and neither Spain nor Mr. Meade ever thus construed it, or consented to such construction.
The naked claims of American citizens against foreign governments, unestablished and unacknowledged, the government may renounce with or without consideration, and it can be held liable only for the consideration it receives and in the manner provided by treaty or by statute. But the property of an American citizen, whether it consists of material objects, or whether it be only an incorporeal evidence of debt, can be taken from him only upon the condition prescribed by the Constitution of the United States, and that condition is, that he shall receive just compensation.
The property of Bichard W. Meade was taken by the defendants without his consent and against his request; his claim has been referred specially by the Congress of the nation to this court that justice may be done, and I think judgment should be given for the claimant.
This case now goes off upon the ground of the decision of the commissioners under the treaty, and for the reason that it falls within the celebrated rule of Lord Chief Justice DeGray, in the Duchess of Kingston case. It Were easy to show that that rule has never been *319 extended beyond the precise subject-matter, and that court after court have regarded it, not as a defence to the merits, but as a defence shutting out the merits, and have repeated the old comment of Coke, that estoppels are odious and not to be favored in law. In this case the same subject-matter, I think, was never brought before the commissioners, hut an essentially different claim, which they properly rejected.
But apart from that affirmative view of the legal question, I think that the defence is not presented here. The case comes back to us from Congress. If it had been referred in the ordinary routine I should say that Congrees had waived no legal defence. But it comes back to us by the special action of Congress, and its history was known then to Congress as fully as to the members of this court. For forty years it has been written and rewritten upon the journals of Congress. Its evidence lies all within the public records of the state papers printed by the will of Congress. It has been again and again investigated by the committees of Congress. There never was a case of which Congress had so full, and accurate, and thorough a knowledge. Nay, more than this, Congress had before them the decision of this court, dismissing the case upon this very ground. Must we say that the supreme council of this great nation, which established this court for great and beneficient ends of justice, has specially waived the former judgment of the court, and specially re-referred the ease, only that the court may repeat its former decision, and dismiss it upon a technical ground ? Could it have been the intention of Congress to send back such a case so thoroughly known, so favorably regarded, in order that it should not be heard upon its merits ? I cannot help thinking that the court are interposing a defence which the defendants have withdrawn. (See case, ante.)